456 July 15, 2026 No. 663

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILLIAM RICHARD McDONALD II,
*Defendant-Appellant.*

Lane County Circuit Court
23CR41608; A185262

Charles M. Zennaché, Judge.

Submitted June 16, 2026.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Laura A. Frikert, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Dan Rayfield, Attorney General, Paul L. Smith, Interim Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Kamins, Judge, and Kistler, Senior Judge.

TOOKEY, P. J.

Affirmed.

## TOOKEY, P. J.

A jury found defendant guilty of first-degree unlawful sexual penetration, ORS 163.411 (Count 1); using a child in a display of sexually explicit conduct, ORS 163.670 (Count 2); and three counts of first-degree encouraging child sexual abuse (ECSA), ORS 163.684 (Counts 3, 4, and 5). The victim, L, was the granddaughter of defendant's partner. Count 1 was based on evidence that defendant put his finger in L's vagina when L was asleep. Counts 2 to 5 were based on photos found in defendant's Google account, including snapshots of images found on the internet and photos of L. A jury found defendant guilty of the charges. On appeal, defendant raises seven assignments of error. We affirm.

### I.   FACTS

On April 16, 2023, when L was 7 years old, L brought her phone to her parents and told them that defendant had "sent [her] something inappropriate." L's mother testified that L "kind of just like tossed *** it, [and] she said 'I don't want to touch that ever again' and we looked and it was a picture of [defendant's] penis." L's mother was upset. She took screenshots of images on the phone, and then she disconnected L's phone from defendant's account. L's mother took the screenshots because she was worried that she "would lose the evidence."

After L's mother disconnected defendant's email account, she "[t]ried to process [her] feelings and [her] emotions and then cried." L's mother did not want to ask L directly whether there had been "inappropriate touches and things," and she wanted L to tell her what had happened "on her own" and "in a nonbiased way." At "the beginning of the summer," L eventually disclosed to her mother that when L was sleeping in a bed with defendant and her grandmother, L had woken up because defendant's finger was in her vagina. When L told him, defendant said, "'Oh, sorry' and went back to sleep."

L's mother did not immediately report that information to the police, but she made sure that L did not have any more contact with defendant. Eventually, L's mother became

worried that defendant might harm L's grandmother, so she went to the police department on August 11, 2023.

A detective conducted a forensic assessment of L's phone and determined that Google had enabled photo sharing between defendant's account and L's account on April 16, 2023, which was the same day that L told her mother defendant had sent her something inappropriate. The detective obtained a warrant to search defendant's Google account. The charges in Counts 2 to 5 of using a child in a display of sexually explicit conduct and ECSA were based on photos found by the detective in defendant's account.

L participated in a forensic interview at a child advocacy center on August 25, 2023. After that interview, police went to defendant's residence. At the residence, police advised defendant of his *Miranda* rights. Defendant admitted to sharing photos with L's email account when he was drunk, but he did not think that L had access.

Defendant admitted touching L's vagina "once." He stated that he had a "curiosity," and he "felt really bad after [he] did it." Defendant denied penetrating L's vagina with his finger. According to defendant, he was having "sexual dreams," and he woke up to discover that his "hands were in her pants." When L woke up, defendant apologized. Defendant also acknowledged that he took some photos of L. Defendant said that he wanted to kill himself when he learned that L had received the photos.

During a break in the interview, defendant drank "floor stripper" and said he hoped it would kill him. Medics arrived and indicated that defendant should be observed at a hospital. While in a patrol car on the way to the hospital, defendant, who was in handcuffs, started hitting his head on a metal bracket in the backseat. Defendant told the officer who was driving the car that defendant was trying to kill himself. The officer told defendant to stop, and defendant complied. When they arrived at the hospital, there were some red marks on defendant's head but no blood.

At the hospital, defendant wrapped cords around his neck and began strangling himself. An officer had to wrestle with defendant to remove the cords. Defendant also

tried to smother himself with a pillow and to impale his eye on a bed rail, and the officer had to hold defendant's head down to prevent him from doing so. Defendant said that he wanted to die and that the officer "should just let him."

After a trial, the jury found defendant guilty of the charges.

## II.  ANALYSIS

On appeal, defendant raises seven assignments of error. His first four assignments of error concern rulings on the admissibility of evidence. His last three assignments concern the meaning of "participating" in a lewd exhibition. We begin with the evidentiary arguments.

A.  *The admissibility of L's statements to her mother.*

In his first and second assignments of error, defendant argues that the trial court erred in admitting two of L's hearsay statements. L's mother described what L had said to her, and defendant objected that the statements were hearsay, but the trial court overruled the objection. The trial court determined that L's statements were not admitted for their truth, but to show their effect on L's mother. On appeal, defendant argues that the trial court erred in admitting the statements, and that the error was not harmless.

We review whether evidence constitutes inadmissible hearsay for legal error. *State v. Hartley*, 289 Or App 25, 29, 407 P3d 902 (2017). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). "An out-of-court statement is not hearsay if it is offered to show the statement's effect on the listener, and the effect on the listener is relevant." *State v. Schiller-Munneman*, 359 Or 808, 817, 377 P3d 554 (2016).

The first assignment of error concerns the admissibility of two of L's statements: (1) L told her mother that "'[defendant] sent me something inappropriate,'" and (2) L said, "'I don't want to touch that ever again.'" In arguing against the admissibility of the statements, defendant argues that "to the extent the state offered the evidence to explain [L's mother's] conduct—that she took screen shots

of the photos on [L]'s phone but did not immediately con-
tact police, but eventually did—those issues were neither
material nor in controversy. Obviously, police at some point
obtained the images from [L]'s phone and became involved
in the investigation."

In assessing that argument, we begin with preser-
vation. Defendant objected when L's mother was about to
testify that L said that defendant had sent her something
inappropriate, but defendant did not object when L's mother
testified that L said, "'I don't want to touch that ever again.'"
We generally require a party objecting to the admissibility
of evidence to identify the ground for the objection, unless
the ground is apparent from the record. *State v. Villar*, 287
Or App 656, 658-59, 404 P3d 1095 (2017). But here, defen-
dant did not object at all to the admissibility of L's second
statement. Therefore, defendant did not preserve the issue
of whether that statement was inadmissible hearsay, and
we do not address that argument.

Turning to L's first statement, namely, her state-
ment that defendant had sent her something inappropriate,
we assume without deciding that the statement was hear-
say. Even so, it was harmless to admit it because there was
other evidence that defendant sent L something inappro-
priate, including defendant's acknowledgment that he had
shared photos with L when he was drunk, including a photo
of defendant's penis. As a result, any error in admitting the
testimony of L's mother about L's statement was harmless.
*See, e.g.*, *State v. Simon*, 294 Or App 840, 858, 433 P3d 385
(2018), *rev den*, 365 Or 502 (2019) (determining that the
challenged statement was cumulative of other evidence pre-
sented and therefore its admission was harmless).

For similar reasons, we reject defendant's second
assignment of error, in which he challenges the admissi-
bility of L's statement that she woke up to find defendant's
finger in her vagina. During the trial, L's mother was not
the only witness to testify regarding that incident. L herself
testified that when sleeping in defendant's bed, she woke
up and felt a hand "wiggling around in my private part,"
which she clarified meant her vagina, and that when she
woke defendant and "told him that he was touching [her]

private part," he said "'Oh, I'm sorry.'" And, in video recordings, defendant stated that that he was having "sexual dreams" and woke up to find that his "hands were in her pants." As a result, even if the challenged statement was hearsay and inadmissible, its admission was harmless. *See State v. Hobbs*, 218 Or App 298, 309, 179 P3d 682, *rev den*, 345 Or 175 (2008) (admission of victim's hearsay statements was harmless where statements were "cumulative of [the victim's] testimony"). We therefore affirm on the first and second assignments of error.

B.   *The admissibility of evidence of defendant's acts of self-harm and his statements that he wanted to kill himself.*

In his third and fourth assignments of error, defendant argues that the trial court erred in admitting evidence of his acts of self-harm and his statements that he wanted to kill himself. Below, defendant objected that the evidence was not relevant, that it was more prejudicial than probative, and that it was "improper impeachment." The trial court overruled the objection indicating that it was evidence of consciousness of guilt. On appeal, defendant renews his arguments that the evidence was inadmissible under OEC 401 and OEC 403.

Whether evidence is relevant presents a question of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. That rule of evidence "establishes a very low threshold for the admission of evidence; evidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000) (internal quotation marks omitted). However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" OEC 403. "We review a trial court's decision to admit evidence over an OEC 403 objection for abuse of discretion." *State v. Davis*, 291 Or App 146, 159, 419 P3d 730, *rev den*, 363 Or 481 (2018).

We begin with whether the evidence was relevant. We agree with the trial court that evidence of defendant's acts of self-harm and his statements that he wanted to kill himself were relevant because those acts and statements occurred after defendant was confronted by police, and his reactions tended to show that he had a guilty conscience. That evidence is like evidence of a defendant's "flight, concealment, and use of a false name," which, if established, "are admissible as evidence of a guilty conscience, which is some evidence of guilt." *State v. Brown*, 231 Or 297, 300, 372 P2d 779 (1962); *see also State v. Kropf*, 339 Or App 245, 250, 568 P3d 224, *rev den*, 374 Or 379 (2025) ("[B]oth the Supreme Court and our court have concluded that evidence of flight, if established, may be admitted for the purpose of showing a guilty conscience."). Here, because defendant engaged in the acts of self-harm and made the statements about wanting to kill himself after being confronted with photos and statements of the victim, defendant's acts and statements were evidence of a guilty conscience, which, in turn, had some tendency to make it more probable that defendant had committed the crimes.

In arguing otherwise, defendant claims that it was speculative to rely on his acts of self-harm and his statements that he wanted to kill himself to infer that he was guilty of the charged crimes. *See State v. Bivins*, 191 Or App 460, 467, 83 P3d 379 (2004) ("Reasonable inferences are permissible; speculation and guesswork are not."). Defendant also argues that his "mental health challenges" were not admissible to show consciousness of guilt. As defendant puts it, the fact that his "mental state was such that it had led him to express a desire to harm himself and engage in acts of self-harm does not allow an inference that defendant was guilty of the charged crimes." We understand defendant to contend that his acts and statements were evidence of mental health challenges, not evidence of consciousness of guilt. But whether or not it would have been reasonable to draw an inference about defendant's mental health from his acts and statements, defendant engaged in those acts and made those statements after being confronted by the police. As a result, it would have been reasonable for the jury to view defendant's reactions as circumstantial evidence of a guilty

conscience or, in other words, as circumstantial evidence that defendant knew or was aware that he had engaged in the alleged misconduct. *See id.* (explaining that "the established facts may support multiple reasonable inferences and, if they do, which inference to draw is for the jury to decide"). Therefore, defendant's acts of self-harm and his statements that he wanted to kill himself were relevant and probative of whether he had committed the crimes.

Furthermore, we discern no abuse of discretion in the trial court's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. In arguing that the evidence was unduly prejudicial, defendant's only argument is that it "was likely to overpersuade the jury." But evidence is not unfairly prejudicial merely because it is harmful to the defendant. To the contrary, unfair prejudice means an undue tendency to decide a case on an improper basis, commonly an emotional one. *State v. Davis*, 372 Or 618, 634, 553 P3d 1017 (2024). In seeking to admit evidence of defendant's acts of self-harm and his statements that he wanted to kill himself, the state did not appeal to the jury's emotions or otherwise encourage the jury to decide the case on an improper basis. Instead, in the absence of any evidence that there were other factors that may have prompted defendant to react in that way, it would have been logical and reasonable for the jury to view defendant's reactions as evidence of his consciousness of guilt. Therefore, we discern no abuse of discretion in the trial court's ruling that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

C.   *Whether L participated in sexually explicit conduct.*

In his fifth assignment of error, defendant argues that he should have been acquitted of the charge in Count 2 of using a child in a display of sexually explicit conduct under ORS 163.670. According to defendant, because L was asleep when he photographed her, there was no evidence that the child "participated or engaged in sexually explicit conduct." We conclude that defendant fails to show that the trial court committed plain error when it did not *sua sponte* acquit him of that charge.

A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels or induces "a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording." ORS 163.670(1)(a).[1] "Sexually explicit conduct" is defined as including "[l]ewd exhibition of sexual or other intimate parts." ORS 163.665(3)(f).

Under Count 2, the jury found defendant guilty of using a child in a display of sexually explicit conduct based on evidence that defendant, while L was asleep, took a photo in which he used his hand to move L's underpants to one side so that he could take a photo of L's pubic area. Although defendant did not make the argument below, on appeal, he argues that the evidence was insufficient to show that L *participated or engaged in* sexually explicit conduct because L was asleep when defendant took the photo. The state responds that it is not obvious or beyond reasonable dispute that L did not participate in sexually explicit conduct. We agree with the state.

"Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). However, we have discretion to correct a "plain" error. ORAP 5.45(1). An error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013).

Here, based on dictionary definitions of the word "participate," defendant cannot show that the trial court plainly erred in failing to *sua sponte* acquit him of the charge in Count 2. Defendant argues that a sleeping child cannot be said to have "participated or engaged in sexually explicit conduct," but the legislature did not define the term "participate," and it is a word of common usage. In such instances, "we frequently consult dictionary definitions to determine the meaning of such terms on the assumption that, if the

---

[1] ORS 163.670 has been amended since the time of the events at issue. Or Laws 2023, ch 407, §§ 2, 5. Because those amendments do not affect our analysis, we cite the current version of the statute.

legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended." *State v. Branch*, 362 Or 351, 357, 408 P3d 1035 (2018) (internal quotation marks omitted). To participate in something can mean "to take part in something (as an enterprise or activity) [usually] in common with others," but it can also mean "to have a part or share in something." *Webster's Third New Int'l Dictionary* 1646 (unabridged ed 2002). Based on the evidence that defendant moved L's underpants to the side when she was asleep and took a photo of her pubic area, it was reasonable for the jury to conclude that L "had a part" in defendant's taking of the photo. It is not obvious or beyond reasonable dispute that the statute was not intended to encompass and criminalize that kind of conduct and thus it was not plain error not to acquit defendant of the charge.[2]

In arguing otherwise, defendant relies on *State v. Parra-Sanchez*, 324 Or App 712, 527 P3d 1008, *rev den*, 371 Or 333 (2023), but in doing so, defendant mischaracterizes the case. According to defendant, we stated in *Parra-Sanchez* that, in a prosecution for using a child in a display of sexually explicit conduct, "the focus must be on [the child's] conduct in determining whether a lewd exhibition occurred." But what we actually said was different: "As applied in this case, *because neither visual recording nor a live show are implicated*, the focus must be on [the child's] conduct in determining whether a lewd exhibition occurred." *Id.* at 736 (emphasis added).

In the instant case, of course, there was a visual recording: the charge is based on defendant's taking a photo of L's pubic area. In *Parra-Sanchez*, we did not interpret what it means to "participate" in a lewd exhibition; instead, we disavowed sole reliance on a defendant's subjective intent in determining whether an exhibition is lewd, and we explained that "whether something constitutes a lewd exhibition is determined by reference to objective standards." *Id.* at 733. That objective determination can depend on factors

___

[2] For example, if a defendant had drugged a child, and then photographed or videotaped the child's body, it seems unlikely that we would say that the defendant could not be charged with committing the crime of using a child in a display of sexually explicit conduct merely because the child was unconscious.

including "whether the focal point of the visual depiction is on the child's genitalia or pubic area," and "whether the child is fully or partially clothed, or nude." *Id.* at 734 (internal quotation marks omitted). *Parra-Sanchez* provides no direct support for the argument that a sleeping child cannot be said to participate in a lewd exhibition.

Defendant also relies on *State v. Bates*, 304 Or App 732, 472 P3d 768 (2020), but, in that case, we also did not directly address the scope of participating in a lewd exhibition of sexual or other intimate parts under ORS 163.670 and ORS 163.665(3)(f). Nevertheless, in *Bates*, we did emphasize that mere proximity to, or observation of, sexually explicit conduct is not sufficient to prove that a child participated or engaged in that conduct. *Id.* at 745. We concluded that the trial court erred in failing to enter a judgment of acquittal on a charge of first-degree ECSA because the child "had no part at all in" the sexually explicit conduct that the defendant had videotaped. *Id.* at 748.

By contrast here, L was not merely in proximity to sexually explicit conduct; instead, defendant moved *her* underwear to one side and took a photo of *her* pubic area. As the state puts it, L participated in the exhibition "by serving, in essence, as defendant's model." Thus, even though L was asleep at the time, defendant caused her to "have a part in" a lewd exhibition. As a result, she can be viewed as participating in sexually explicit conduct, and the trial court did not plainly err when it did not *sua sponte* acquit defendant of the charge in Count 2.

D.   *Whether the trial court plainly erred in failing to provide a supplemental jury instruction on the meaning of lewd exhibition.*

In his sixth and seventh assignments of error, defendant argues that the trial court plainly erred when it did not provide a supplemental jury instruction on the meaning of "lewd exhibition" under the counts for using a child in a display of sexually explicit conduct and for first-degree ECSA. In its instructions to the jury, the trial court explained the elements of those crimes, and it also instructed the jury that "sexually explicit conduct" includes "lewd exhibition of

sexual or other intimate parts," and that "female genitals are sexual parts." According to defendant, the jury instructions were incomplete given subsequent case law on the meaning of "lewd exhibition."

In *Parra-Sanchez*, 324 Or App at 733, we explained that a "lewd exhibition" means "the showing of a child's sexual or other intimate parts that is itself salacious or focused on sex," and that whether something constitutes a lewd exhibition is "determined by reference to objective standards." *Id*. We emphasized that whether an exhibition is "lewd" depends on "the characteristics of the exhibition as it would be perceived by a viewer of the display or recording, and not through an examination of the subjective intentions of the child, the intended viewer, or the person creating the display, if that person is someone other than the child or the viewer." *Id*.

On appeal, defendant argues that the trial court plainly erred when it failed to provide a more fulsome definition of "lewd exhibition" in the jury instructions because "the common meaning of the phrase does not adequately convey the objective nature of the legal definition," and the trial court's definitions did "not convey that a lewd exhibition must be objectively lewd and not merely inciting of the sexual desires or imaginations of the person possessing the exhibition."

However, in *State v. Worsham*, 373 Or 739, 743-49, 571 P3d 759 (2025), *modified on recons*, 374 Or 781, 583 P3d 1042 (2026), the Supreme Court rejected a similar argument about a custom, supplemental instruction that related to the definition of "initial aggressor" in self-defense cases. The court explained that when the argument on appeal is that the trial court should have given an instruction that was not requested below, then that "presents a challenge under plain error review, because plain error requires a showing of legal error appearing on 'the record.'" *Id*. at 748 (quoting *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991)). The court continued,

> "When the ungiven instruction is a custom supplemental instruction, as opposed to another uniform instruction, and no actual custom supplemental instruction was requested

at trial, the accuracy and completeness of that theoretical instruction cannot appear on the record, and the theoretical instruction cannot be assessed as to whether it is legally correct in all respects. As such, it is generally impossible for a trial court's failure to give an *unrequested* custom supplemental instruction to qualify as plain error."

*Id.* (Emphasis in original; internal citations and quotation marks omitted.) Applying that reasoning here, the trial court did not plainly err by failing to provide additional instructions on the meaning of "lewd exhibition" because defendant does not identify what exactly the supplemental instruction should have stated, and he cannot show that it is apparent on the record that the trial court erred in failing to provide that instruction. We therefore affirm on the sixth and seventh assignments of error.

Affirmed.